**UNITED STATES of America,**
**Plaintiff,**

v.

**PROCTER & GAMBLE COMPANY et al.,**
**Defendants.**

**Civ. A. No. 1196-52.**

United States District Court
D. New Jersey.

Jan. 27, 1959.

Addendum March 19, 1959.

See also, D.C., 19 F.R.D. 247.

Chester A. Weidenburner, U. S. Atty., Charles H. Hoens, Jr., Asst. U. S. Atty., Newark, N. J., Joseph E. McDowell, Antitrust Division, Dept. of Justice, Washington, D. C., for plaintiff.

O'Mara, Schumann, Davis & Lynch, Jersey City, N. J., Cahill, Gordon, Reindel & Ohl, Mathias Correa, New York City, for Colgate-Palmolive Co.

Bailey & Schenck, Newark, N. J., Arnold, Fortas & Porter, Abe Fortas, Washington, D. C., for Lever Bros. Co.

Toner, Crowley, Woelper & Vanderbilt, Newark, N. J., Royall, Koegel, Harris & Caskey, Kenneth C. Royall, New York City, Dinsmore, Shohl, Sawyer & Dinsmore, Joseph Dinsmore, Cincinnati, Ohio, Taft, Stettinius & Hollister, Charles Sawyer, Cincinnati, Ohio, for Procter & Gamble Co.

Davies, Richberg, Tydings, Landa & Duff, Shelby Fitze, Washington, D. C., McCarter, English & Studer, Newark, N. J., for Association of American Soap & Glycerine Producers.

HARTSHORNE, District Judge.

Defense counsel have moved the Court in this case to fix a cut-off date for the taking of evidence to begin immediately subsequent to World War II and some six years prior to the filing of the complaint herein on December 11, 1952. Plaintiff Government asks to have the evidence extend back to 1926, or thereabouts, in order to prove the inception of the alleged conspiracy, same being one to fix prices and to monopolize the manufacture and sale of soaps and detergents for household use throughout the United States. The Government admits that it does not desire to give evidence as to the inter-

mediate war period from, presumably, 1941 to 1946, when the Government's wartime regulations of business were in effect.

In determining this question, certain general principles must be borne in mind:

(1) All agree that these Government antitrust cases, generally characterized as the "Big Case", should be kept down to manageable proportions, not only to enable the Court to serve the many other litigants besieging its doors, but because justice is more apt to emanate from fresh and vigorous intellects than from intellects exhausted by a trial lasting for months on end.

■ (2) The purpose of a civil injunction suit of this nature is not to punish defendants but to prevent a continued violation of the Sherman Act, 15 U.S.C.A. § 1 et seq., to the injury of the public.

■ (3) To entitle the Government to these equitable remedies, it must establish not only (a) that such a conspiracy once existed, but that (b) it still existed close to the time of the filing of the complaint so as to create a probable continuing danger to the public. Indeed, due to the unusual lapse of time which has existed between the time of the filing of the complaint herein and this motion, due to an act of God, an appeal to the United States Supreme Court, and otherwise, it may even be necessary, should a violation proximate to the complaint be proven, to take further evidence as to the time after the filing of the complaint, to see if any danger of the continuance of any such conspiracy down to date does exist. But that angle of the matter, as to relief, we pass by, pending the determination of the question of the scope of the evidence, as to whether a postwar violation existed reasonably close to the time of the filing of the complaint.

(4) But, even though a conspiracy may have its inception many years previous to the filing of the complaint, that early evidence, here prewar, may still have a bearing on the crucial evidence of violation proximate to the complaint, because this earlier evidence may show the relationship of the parties and the intent with which they acted, not only years ago, but presumptively thereafter. For instance, if parties have been in close and long relationship, it would take much less time and formality to agree to continue a plan of action than if the situation were otherwise.

(5) On this matter of the fixing of cut-off dates, precedents are of little aid, because not only is the world full of "all sorts and conditions of men", as was long ago said by Sir Walter Besant, but, for that very reason, their activities generally, and specifically in fixing prices and creating monopolies, have infinite variations. Of course, it is these very variant facts which we are now determining how to try.

Applying the above principles to the case at bar, the result is:

The prime point which must be established by the Government is that this conspiracy existed proximate to the complaint—from 1946 down to the filing of the complaint in December, 1952. Unless this is established, plaintiff will not have proved a violation of the Sherman Act presently endangering the public. Defendants claim not only that the Government will not be able to prove this conclusion, but call attention to the fact that it will require evidence over the course of some six years, as to the activities of these, the three largest soap and detergent manufacturers in the United States, in regard to their countrywide activities, plus the activity of the Association, to prove this crucial issue. They further call attention to the fact that to prove the entire possible gamut of the case, even omitting the entire war period, for reasons hereafter stated, will more than treble this evidence—to cover more than twenty years, and test the memory of witnesses as to incidents occurring over thirty years ago. Government counsel admit that their discovery so far has resulted perchance in their desire to use almost a million documents, and that even if the bulk of these documents can be

submitted to the Court in graph or summary form, subject to checking by the defendants, there will be many hundred crucial documents which must be put individually in evidence.

Obviously, the simpler this maelstrom of papers can be kept, the more likely it is that the human mind will reach a sound and just conclusion. Furthermore, the Government admits that the war period of some five years, from 1941 to 1945, will not evidence this conspiracy, but creates a natural gap between the evidence of a violation proximate to the complaint, crucial to the Government's case, and its potential evidence as to the much earlier inception of the conspiracy.

If, then, this natural gap of the war years is used to separate the trial into stages, several advantages may well result: (a) the first stage of the trial will be expedited, due to the lessening of the preliminary discovery from twenty-odd to six years, (b) the human mind will be better able to cope with two trials, each lasting several weeks, than with a single trial lasting months on end, (c) the second stage of the trial may never have to occur at all. This last will result, if the Government's evidence of a violation in the postwar years clearly overcomes the defendants' evidence. It may result again if the following occurs: Upon the taking of the postwar evidence at this first trial stage, the Court will expect the Government to make explicit written representations as to its prewar evidence covering the fifteen years from 1926 to 1941 concerning the relationship between the defendants and their intent as to a violation of the Sherman Act at that time, and as presumably continuing through the postwar period. If, upon the basis of such representations by the Government, and as well upon the similar representations of the defendants as to their claimed countervailing factors, plus the actual proof as to the postwar period, it should appear clear that no violation of the Sherman Act existed postwar, it would then do no good to take such prewar evidence covering such fifteen year period. On the other hand, if, upon the

basis of such actual proof as to the postwar violation, and the above representations as to the prewar period as continuing postwar, there should be a real question as to the existence of postwar violations by the defendants, then the second stage of the trial should occur as to their relations and intent prewar and the fact of its presumptive continuance postwar. For certainly, even assuming a prewar violation, since there was admittedly no violation during the period of the war, if there is no proof of a violation postwar, i. e., no proof of a violation of the Sherman Act by these defendants for the entire ten years before the filing of the complaint, any probability of a present danger to the public therefrom would be simply nonexistent, and it is such danger which can alone justify the granting of equitable relief by this Court.

Of course, the above trial procedure has the disadvantage of proving postwar evidence prior to the possible proof of prewar evidence, and if these two periods were not separated by the war period of some six years, when no evidence of conspiracy admittedly exists, some confusion might perchance be caused thereby. However, this admitted gap of some six years should clearly suffice to obviate confusion on the part of all concerned. Thus that disadvantage cannot outweigh the possibly unnecessary burden of the more than trebled period of proof placed on all concerned, if from the very first the discovery and the trial is to cover not six, but more than twenty years.

While, as noted previously, specific precedents as to the use or nonuse of cut-off dates by the courts in these "Big Cases" are of small help, due to the infinite variation in the facts in each case, it might be noted that the two Seminars conducted during the last two years in New York City and Palo Alto on "Protracted Cases", under the auspices of the Judicial Conference of the United States, and upon the basis of the well-known Prettyman Report, reached conclusions closely paralleling the above. Specifically, at the New York conference, in

1957, the resolution was adopted that "In determining whether cut-off dates will be established the particular facts of each case must be considered. Varying dates may be adopted for different issues." Similar conclusions were alluded to at Palo Alto. Further, in the 1954 Report of the American Bar Association Committee on Practice and Procedure in the Trial of Antitrust Cases, that study concluded as follows:

"In civil as well as criminal cases, for example, it would seem entirely appropriate for the court to require the plaintiff to present evidence that tends to show a case of present violation of law before permitting any evidence as to the origin of the conspiracy or the background of the industry. Such period could be rather strictly limited to perhaps five or six years."

█ Thus, the first trial stage in this cause will be confined to evidence as to the postwar period down to the time of the filing of the complaint, December 11, 1952. In connection with such trial, the Court will consider the written representations of all counsel, pro and con, as to the relationship between, and the intent of, the defendants prewar, as above, as perchance continuing and coloring the postwar evidence in that regard. Should these representations appear material and substantial, such representations will then become the issues to be tried at the second trial stage. See Chaps. *VII. Separation of Issues,* and *VIII. Period of Inquiry, Procedure in Anti-Trust and Other Protracted Cases, A Report Adopted by the Judicial Conference of the United States, September 26, 1951* (Prettyman Report).

Finally, due to the exceptional factors of delay in this case occurring before this Court took control of the situation, it may be necessary, if the plaintiff has established a postwar violation of the Sherman Act, to give further opportunity to the parties to establish by evidence, as to the years succeeding the filing of the complaint in 1952, the extent of the present danger to the public as bearing upon appropriate relief. But no attempt should be made to cross that bridge before it is reached.

An order may be entered accordingly.

## Addendum

Shortly following the filing of the cut-off opinion herein, dated January 27, 1959, the Court advised all counsel at pretrial that, in the light of the Government's previous written representations as to the nature of its prewar proof, it had real doubt as to whether it would not be obliged to give the Government the right to introduce such proof ultimately. Further that, in order not to do injustice by comparing stale evidence with fresh evidence as to related issues, the Court must insist that months on end not be permitted to intervene between the first stage and the second stage of trial, in order to permit the defendants then to carry through their lengthy prewar discovery. Accordingly, the Court insisted that, before any trial, all parties would be required to complete both their prewar and postwar discovery. Therefore, the Court overruled the request of the defendants to delay their prewar discovery until after the first stage of trial. Thereupon the defendants indicated generally, with the exception of Colgate-Palmolive, and that of the Association which, though requested, did not state its viewpoint, that they did not want a two-stage trial, if they had to complete their discovery before any trial. Since the Government had never wanted a two-stage trial, the Court, particularly because of its doubt that a second stage trial could be avoided, determined to abandon the two-stage trial in favor of the usual single trial.

In the interest of accuracy, the Court would call attention to the following in its cut-off opinion:

"The Government admits that it does not desire to give evidence as to the intermediate war period from, presumably, 1941 to 1946, when the Government's wartime regulations of business were in effect."

This does not mean that the Government admits that such are accurate dates, or

that no violations by the defendants occurred between such dates. Nor does the Government admit the defendants' claim that it may use almost a million documents in its proof. However, it is clear that the Government will use documents literally in the thousands, so the exact number of documents to be used is theoretically, though not practically, immaterial.